## AFFIDAVIT OF MEGHAN RONAYNE
## IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Meghan Ronayne, being duly sworn, state as follows:

1.      I am a Special Agent with the United States Department of Homeland Security,

Immigration and Customs Enforcement, Homeland Security Investigations ("HSI").  I have been

employed by HSI since August 2020 and I am currently assigned to the Office of the Special

Agent in Charge ("SAC") in Boston, Massachusetts.  I am a graduate of the Federal Law

Enforcement Training Center in Glynco, Georgia, where I received training to become a federal

agent; specifically, I received a certification in the Criminal Investigator Training Program and

the HSI Special Agent Training Program.  As part of my duties, I am authorized to investigate

violations of the laws of the United States, including criminal violations relating to child

exploitation, child pornography, coercion and enticement, and transportation of minors,

including but not limited to violations of 18 U.S.C. §§ 2422, 2251, 2252, and 2252A.  I have

conducted and participated in several investigations of violations of those statutes.  I have also

previously assisted in the execution of numerous federal search warrants in connection with

these investigations.  I have received training in the investigation of child pornography, child

exploitation, and transportation of minors, and have had the opportunity to observe and review

examples of child pornography (as defined in 18 U.S.C. § 2256).

2.      This affidavit is submitted in support of an application for a warrant to search the

residence of Larry STEPHEN (YOB: 1978) ("STEPHEN") at 71 Crosby Road, Marlborough,

Massachusetts (the "SUBJECT PREMISES"), as described in Attachment A-1 and the person of

STEPHEN, as described in Attachment A-2.  As described herein, there is probable cause to

believe that the SUBJECT PREMISES and the person of STEPHEN contain contraband and

evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2)(A) &

2252A(a)(5)(B) (possession, receipt, and distribution of child pornography) (collectively, the

"SUBJECT OFFENSES"), which items are more specifically described in Attachment B of this

Affidavit.

3.      The statements in this Affidavit are based in part on information provided by

other law enforcement officers and my review of records, as well as on my own investigation of

this matter and my training, experience, and background as a Special Agent with HSI.

4.      Because this Affidavit is being submitted for the limited purpose of securing the

requested search warrants, I have not included each and every fact known to me concerning this

investigation.  I have set forth only the facts that I believe are necessary to establish probable

cause for the requested search warrants.

### *FACTS IN SUPPORT OF PROBABLE CAUSE*

### I.      **Background Regarding Social Media Platform A**

5.      Homeland Security Investigations ("HSI") is currently conducting a national

operation targeting individuals seeking to travel in interstate/foreign commerce for the purposes

of engaging in sexual acts with minors, as well as the distribution and trading of child

pornography via Social Media Platform A.[1]

6.      In review of Social Media Platform A's website and other law enforcement

resources, I have learned that Social Media Platform A is a free instant messaging application

that allows users to exchange end-to-end encrypted and content-expiring messages, including

photos, videos, and file attachments. The software is available for the iOS, Android, Mac,

---

[1] The name of Social Media Platform A is known to law enforcement and intentionally omitted to protect the ongoing investigation.  The name of the social media platform will be provided upon the Court's request.

Windows, and Linux operating systems (i.e. cell phones and computers).  Social Media Platform

A has three messaging products, a base level, Pro, and Enterprise.  The Pro version includes

additional features such as,

> (a)  Group Messaging (Up to 500 members)
>
> (b)  Audio and Video Calling (Up to 70 participants)
>
> (c)  Broadcasting/Live Streaming (Up to 500 members)
>
> (d)  File Share (Up to 5GB)
>
> (e)  Message Expiration Timer Settings (Up to 30 days)

7.      All Social Media Platform A users can create one-to-one direct messages or group

conversations.  Pro users can create "rooms" which are essentially the same as group

conversations except that rooms can have assigned moderators who can add members, add

moderators, configure room settings, and remove users from the rooms.  This moderator feature

is only available to Pro users.  There are no moderators in standard group conversations,

commonly referred to as "Groups," therefore users cannot be removed from Groups.

8.      Social Media Platform A uses multiple layers of encryption to provide end-to-end

encryption for users.  Social Media Platform A does not use phone numbers for communication.

All sending and receiving of messages is done via the Social Media Platform A servers using the

Social Media Platform A ID, similar to how phone numbers are used for telephone calls.  The

Social Media Platform A ID is a 4-to-16-character unique username that is used to sign in and

communicate with other users.  Once created, the Social Media Platform A ID cannot be

changed.  If a user chooses to create a Pro account, the account creator's email address is used as

the username to allow for account verification and password resets.  To have an anonymous

account, meaning an account and a username with no email address attached, users must create an account using the base level version instead of Pro.

9.      When files are shared within a room or group, they can be accessed by room members until the expiration timer runs out.  Members of the room can view any files that are still accessible by the room, even if they were not a member when the file was originally shared.

## II.      Background on The National Center for Missing and Exploited Children and CyberTipline Reports

10.     The National Center for Missing and Exploited Children ("NCMEC") is a nonprofit organization that, among other things, strives to help find missing children, reduce child exploitation, and prevent child victimization.  It serves as the national clearinghouse for families, victims, private industry, law enforcement, and other professionals regarding information and programs related to missing and exploited children issues.

11.     NCMEC launched the CyberTipline in 1998 to serve as the national online clearinghouse for tips and leads about child sexual exploitation.  The CyberTipline is the method through which the public and electronic service providers ("ESPs") may report the enticement of children for sexual acts, extra-familial child sexual molestation, child pornography, child sex tourism, child sex trafficking, unsolicited obscene materials sent to a child, misleading domain names, and misleading words or images on the internet.

12.     Pursuant to 18 U.S.C. § 2258A, ESPs must report the facts and circumstances of apparent violations of certain federal statutes related to child exploitation, including § 2252A, that are committed with or through the use of their services.  Those reports must be made to the CyberTipline and must include information related to the identity of the individual who appears to have committed the violations, information related to the geographic location of the

individual, information regarding the transmission and discovery of the reported content, and copies of apparent child pornography related to the reported incident.

13.     I am aware through my training and experience that, based on the methods through which ESPs identify, detect, or otherwise flag images of suspected child exploitation, ESPs may or may not review the contents of the files they submit to NCMEC as suspected child pornography.

14.     When an ESP indicates that its employees have manually reviewed the content of the files submitted via a CyberTipline report (or "CyberTip"), a NCMEC employee manually reviews the files to confirm that they meet the criteria to be classified as child pornography. Using publicly available search tools, NCMEC then attempts to locate where the activity occurred based on the information the ESP provides, such as IP addresses.[2]  NCMEC then packages the information from the ESP along with any additional information it has, such as previous related CyberTip reports, and sends it to law enforcement in the jurisdiction where the activity is thought to have occurred.

### III.     Background of Investigation

#### A.  The HSI Greenville, South Carolina Lead

15.     HSI undercover agents have infiltrated various chatrooms on Social Media Platform A dedicated to the discussion and distribution of child pornography.  Undercover investigators were invited to these groups by other individuals on Social Media Platform A.

---

[2] An "Internet Protocol address," or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the internet.  Every computer or device accessing the internet must be assigned an IP address so that internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

Each individual in the chatroom can be observed by reviewing the listed "Room members." Generally, each user is identified by a unique username and/or their email address. Any media files, such as child pornography, posted in these group chats are visible and downloadable by any user in the chatroom. Investigators do not post or distribute child pornography in their undercover role while monitoring these chatrooms.

16.     On or about April 20, 2023, HSI New England received an investigative referral package from HSI Cyber Crimes Center ("C3") Child Exploitation Investigations Unit ("CEIU"). CEIU received this lead from HSI Resident Agent in Charge ("RAC") Greenville, South Carolina, ("HSI Greenville") for Social Media Platform A user MANGOEXHIB@gmail.com (MANGOEXHIB) ("Subject Account 1"). HSI Greenville provided HSI New England with background information concerning Social Media Platform A activity associated with Subject Account 1.

17.     On April 16, 2023, an HSI Greenville Special Agent acting in an undercover capacity, Undercover Agent ("UCA 1"), participated within chat rooms on Social Media Platform A. UCA 1's undercover persona is that of a mother who has a prepubescent child. The chat rooms in which UCA 1 operated comprised of individuals actively participating in the discussion of child sexual abuse and sharing of Child Sexual Abuse Material ("CSAM"). On April 16, 2023, UCA 1 observed Subject Account 1 within the public chat room "Mom Play." UCA 1 observed Subject Account 1 send a post, "Any mom live in the southern New England region or Maryland?"

18.     On April 17, 2023, UCA 1 communicated with Subject Account 1 within a private chat on Social Media Platform A. During this private chat conversation, Subject Account 1 made the following statements:

a. Subject Account 1 stated, "I like ages 2 to 18 girls and adults women."

b. UCA 1 asked Subject Account 1 if he had any experience with little ones, in which Subject Account 1 replied, "Not yet but I want to do it with young girls."

c. Subject Account 1 stated he resides in Massachusetts and Maryland.

d. UCA 1 asked Subject Account 1 what he is into or looking for, in which Subject Account 1 replied, "Family taboo mostly, sexual penetration, I am 44 / male."

e. Subject Account 1 stated that he is married.

f. Subject Account 1 asked UCA 1 if UCA 1 is interested in joining the Social Media Platform A group, "Family Taboo."

19.     On April 18, 2023, UCA 1 continued the private conversation with Subject Account 1. Subject Account 1 further added UCA 1 to the private Social Media Platform A chat group, "Family Taboo." UCA 1 asked Subject Account 1 if he was looking for something real, or just on Social Media Platform A to trade, in which Subject Account 1 replied, "real family taboo."

20.     Subject Account 1 stated that he stays at hotels in Rockville, Maryland weekly, and stated that he works as a professor. Subject Account 1 further stated that his primary residence is in eastern Massachusetts.

21.     On the same day, UCA 1 observed Subject Account 1 post several images and videos within the Family Taboo chat room. These image and video files were viewable to other members of the chat group. Five of the videos posted by the Subject Account 1 were classified as CSAM by UCA 1. Two of the images posted by the Subject Account 1 were classified as

CSAM by UCA 1. Two of the videos determined to meet the federal statutory definition of child pornography are described as follows[3]:

a. One video titled "*Asian pedomom & boy*" is approximately 9 minutes and 43 seconds in length and depicts a prepubescent male who, based on the overall size of the child's body, child-like facial features, and no visible pubic hair, appears to be approximately 9 to 11 years of age.  The child is laying on his back on a bed, wearing a light blue long sleeve shirt and nude from the waist down while an adult female, who is fully nude, is seen performing oral sex on the minor child's penis.  The adult female is then seen straddling the child and inserting his penis into her vagina. The adult female is later seen in the video rubbing the child's penis.  At the end of the video, both the adult female and the child are seen getting dressed.

b. One video titled, *"Luisa&Kitty"* is approximately 12 minutes and 19 seconds in length. The video depicts an adult female and a prepubescent female who, based on the overall

---

[3] I am aware that the "preferred practice" in the First Circuit is that a magistrate judge view images that agents believe constitute child pornography by virtue of their lascivious exhibition of a child's genitals. *United States v. Brunette*, 256 F.3d 14, 17-19 (1st Cir. 2001) (affiant's "legal conclusion parroting the statutory definition […] absent any descriptive support and without an independent review of the images" insufficient basis for determination of probable cause).  Here, however, the descriptions offered "convey to the magistrate more than [my] mere opinion that the images constitute child pornography."  *United States v. Burdulis*, 753 F.3d 255, 261 (1st Cir. 2014) (distinguishing Brunette).  The children described herein include four-year olds through children approximately nine to twelve years old– in all events, younger than eighteen. Furthermore, the descriptions of the files here are sufficiently specific as to the approximate age and appearance of the alleged children as well as the nature of the sexual conduct pictured in each file, such that the Court need not view the files to find that they depict child pornography.  *See United States v. Syphers*, 426 F.3d 461, 467 (1st Cir. 2005) ("The best practice for an applicant seeking a warrant based on images of alleged child pornography is for an applicant to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently whether they probably depict real children.") (emphasis added); *see also United States v. LaFortune*, 520 F.3d 50, 56 (1st Cir. 2008) (similarly emphasizing Syphers court's use of "or" in describing the Brunette "best practice").   Where I have included such nonconclusory, sufficiently specific descriptions, this Court need not view the imagery to find that they depict child pornography.  Nonetheless, the described imagery is available for review at the Court's request.

size of the child's body, child-like facial features, lack of breast development and no visible pubic hair, appears to be approximately 4 to 6 years of age.  The adult female is seen undressing the prepubescent female and licking the child's nipples and vagina. Later in the video, the adult female is seen bending the child over and licking her anus. The adult female then gets fully undressed and is seen fondling the child's vagina, while the child fondles the adult female's vagina at the same time.

22.     On April 19, 2023, Subject Account 1 told UCA 1 that he was an American Sign Language professor, and that his nickname is "Mango."  Subject Account 1 further stated that he stays in Maryland to teach three nights a week during the fall and spring semesters.  Subject Account 1 then sent UCA 1 an image of himself.

23.     Between April 19, 2023, and April 25, 2023, UCA 1 observed Subject Account 1 post several more videos and images within the Family Taboo chat room, thirteen of the videos, and two of the images constitute CSAM.  Two of the videos determined to meet the federal statutory definition of child pornography are described as follows:

a.   One video that is titled *"2021-10-05 17.19.06"* is 1 minute and 47 seconds in length and depicts a fully nude prepubescent male who, based on the overall size of the child's body, child-like facial features, and lack of pubic hair, appears to be approximately 9 to 12 years of age.  In the beginning of the video, a fully nude adult female is seen performing oral sex on the child's penis.  The adult woman then bends over and inserts the child's penis into her vagina. The child is seen penetrating the adult woman with his penis and smacking her buttocks with his hand.

b.   One video that is titled "*VID_20220727_232010_901*" is 43 seconds in length and depicts a fully nude prepubescent female who, based on the overall size of the child's

body, child-like facial features, and lack of breast development and pubic hair, appears to be approximately 5 to 7 years of age.  The female child is seen sitting on the floor with her legs spread open facing the camera. The child is seen licking her finger and inserting it repeatedly into her vagina.

24.      On May 22, 2023, I contacted HSI Greenville UCA-1 and asked if Subject Account 1 had received or distributed CSAM on this date.  UCA-1 confirmed that Subject Account 1 had distributed CSAM in the Social Media Platform A chat room "Family Taboo" on May 22, 2023, between 05:30 AM and 06:30 AM.  Subject Account 1 was observed distributing two images and six videos that I believe constitute CSAM.  Two of the videos determined to meet the federal statutory definition of child pornography are described as follows:

a.   One video titled "April Epic-2-2" was sent to the Social Media Platform A chat room group "Family Taboo" by Subject Account 1 at 6:33 AM and is 29 seconds in length. The video depicts a fully nude prepubescent female who, based on the overall size of her body, lack of breast development, and child-like facial features, appears to be approximately 5 to 7 years of age. The minor female is kneeling on the ground and has both of her hands on an adult male's erect penis. The minor female is observed licking the adult male's penis and performing oral sex on his erect penis.

b.   One video titled "session-attachment-2023-02-25-003251" was sent to the Social Media Platform A chat room group "Family Taboo" by Subject Account 1 at 06:18 AM and is 37 seconds in length. The video depicts a prepubescent female who, based on the overall size of her body and child-like facial features, appears to be approximately 4 to 6 years of age. The video depicts the minor female licking an adult male's erect penis. The adult male is holding the female's head and pushing it onto his penis repeatedly. At the end of

the video, the adult male sticks his penis into the female's mouth and rapidly pushes her head back and forth.

**B.  The NCMEC CyberTip Report # 123608568**

25.     On April 21, 2023, I submitted a deconfliction request to NCMEC for the username mangoexhib (Subject Account 1) and thickmango7 (see paragraph 35), the name Larry STEPHEN, address 71 Crosby Road, Marlborough, MA (the SUBJECT PREMISES), and the email address mangoexhib@gmail.com (Subject Account 1).   The purpose of the deconfliction request was to determine if NCMEC had any knowledge that another law enforcement agency was investigating the entities listed in the request.  NCMEC provided a CyberTip related to the information submitted for deconfliction, specifically related to the username "mangoexhib." CyberTip #123608568 was submitted to NCMEC by Snapchat and was made available to the Massachusetts Internet Crimes Against Children ("ICAC") Task Force for further investigation.

26.     On May 1, 2023, I spoke with Massachusetts State Police ("MSP") Detective Sean Quirk, regarding CyberTip #123608568.  Detective Quirk provided me with the CyberTip file, and all associated files submitted to NCMEC by Snapchat, which I have reviewed. Snapchat provided one image to NCMEC that had been uploaded via a Snapchat account associated with Snapchat username *mangoexhib* ("Subject Account 2").  In the report for CyberTip #123608568, Snapchat reported that on April 29, 2022, at 14:08:05 UTC, Subject Account 2 uploaded one file of apparent child pornography. The CyberTip reported that Snapchat did review the entire contents of the uploaded file of apparent child pornography.

27.     Based upon my review of the image submitted by Snapchat with CyberTip #123608568, I believe that it meets the federal statutory definition of child pornography, and is described below:

a.  One image, *mangoexhib-None-8d8faf0e-0194-5bf4-83f1-9932f3ce8af2~106-f545eda7a2.jpg*, uploaded to Snapchat on April 29, 2022 at 14:08:05 UTC, depicts a prepubescent minor female who, based on the overall size of the child's body, lack of breast development and pubic hair, and child-like facial features, is approximately 9 to 11 years old, sitting on a hardwood floor and holding on to a silver pole. The prepubescent female is wearing a black fishnet full bodysuit. There is a large hole in the vagina area of the body suit where the female's vagina is fully visible and is the focal point of the image.

28.     Snapchat provided NCMEC the following subscriber information associated with Subject Account 2:

| | |
|---|---|
| Phone: | +17742852631 |
| Date of Birth: | 09-26-1978 |
| Email Address: | mango_exhibicionista@yahoo.com |
| Screen/User name: | mangoexhib |
| IP Address: | 73.93.214.42 |
| | 11-27-2016 04:25:44 UTC |

29.     The CyberTip report also provided IP Geo-Lookup information for the IP address used when the file was uploaded to Snapchat which resolves to the Internet Service Provider (ISP) Verizon Fios, in the area of Marlborough, Massachusetts.

**C.  Identification of the Suspect User**

30.     On April 26, 2023, a court Order for Records was served on Google for subscriber information for the Google account: mangoexhib@gmail.com.  That is the email address associated with Subject Account 1.  On May 1, 2023, Google provided the following subscriber information:

Name: Mango Exhib
Given Name: Mango

Family Name: Exhib
e-Mail: mangoexhib@gmail.com
Google Account Target Association Linked by Cookies:[4]
Email: larry@msada-dc.org; mangoaslprofessor@gmail.com
IP Activity: IP Address: 173.76.230.244;  Timestamp: 2022-10-17
13:27:16Z; Activity Type: Login

31.    On or around May 17, 2023, an administrative summons was served on Verizon

Fios for subscriber information for the IP Address linked to Subject Account 1. Verizon Fios

provided the following subscriber information:

Account Creation Date: 12/15/2011
Customer Name: A.S
Account Address: 71 Crosby Rd, Marlborough, MA 01752 (the SUBJECT PREMISES)
Email address: sandhumarit@hotmail.com

32.    HSI conducted open-source research for the email address

mangoaslprofessor@gmail.com, and search results identified a LinkedIn profile for Larry

Stephen ("STEPHEN") which included a profile picture that was visually identical to the image

sent from Subject Account 1 to UCA 1 described in paragraph 22. The LinkedIn profile also

indicated that STEPHEN has worked at Montgomery College in Rockville, Maryland since

January of 2020 as a Program Coordinator and Professor of American Sign Language.

33.    HSI searched a commercially-available database[5] for Larry STEPHEN in

Massachusetts and search results indicated that STEPHEN had a year of birth of 1978, an

---

[4] Based on my knowledge and conversations with other law enforcement, I believe that "linked by cookies" means that the user of Subject Account 1 was likely signed into a Google Chrome browser using the email address associated with Subject Account 1, when also logging into the email addresses larry@msada-dc.org and mangoaslprofessor@gmail.com in Google Chrome. According to the Google website, cookies are small pieces of text sent to your browser by a website you visit. They help that website remember information about your visit, which can both make it easier to visit the site again and make the site more useful to you.

[5] Accurint is a system that uses credit headers as well as other information to compile an information database under specific names and social security numbers. Consequently, if a certain social security number was the sole basis for a query through the system, the system

associated phone number ending in 2631, and a last known address of the SUBJECT PREMISES.

34.     Records from the Massachusetts Registry of Motor Vehicles (RMV) showed that STEPHEN has an active Massachusetts Driver's License, which included a photograph and a mailing address of the SUBJECT PREMISES[6]. STEPHEN's driver's license photograph appears to be the same adult male depicted in the image sent to UCA 1 from Subject Account 1 described in paragraph 22. RMV records also identified three vehicles that are actively registered to Larry STEPHEN: a blue, 2009 Toyota Sienna (MA 312DG9), a gray, 2012 Toyota Prius (MA 3XNY80) and a blue, 2018 Toyota RAV4 (MA 8MP528).

35.     A search of Facebook yielded a Facebook profile belonging to STEPHEN with a profile name of Larry Asl STEPHEN. STEPHEN's Facebook profile photo depicts the same likeness as the adult male described in the image Subject Account 1 sent UCA 1 as described in paragraph 22, the LinkedIn profile, described in paragraph 32, and the RMV photograph described in paragraph 34. One post made on STEPHEN's Facebook account on December 16, 2022, identified his email address as mangoaslprofessor@gmail.com.

36.     Open-source research for the username, "mangoexhib" revealed a profile on the website, Xvideos5.com[7]. The profile provided the following information:

---

would reveal all names and addresses associated with that specific social security number nationwide. Names, addresses and social security numbers are associated by Accurint when a person or persons obtain or apply for credit, apply for a public benefit or public utility, get arrested, obtain a driver's license or identification card, register a vehicle, as well as numerous other actions.

[6] MA RMV records also identified one adult female with the initials "A.S." with a listed residential address as the SUBJECT PREMISES. I know the full name of this individual, but I have listed only initials in the interest of privacy.

[7] Xvideos5 is a pornographic video sharing and viewing website.

> "Man, 45y
> Residing in Massachusetts and Maryland
> Vanilla life
> Working a white collar job
> Chocolat life
> Nudist, sexual pleasures, masturbating, and make new kink friends
> Sexually free!
> Ask me for WhatsApp
> Telegram: Thickmango7
> Wickr: mangoexhib@gmail.com
> Wire: Thickmango7
> Discord: thickmango7 #4562
> Reddit: Thickmango7"

37.     On May 2, 2023, an administrative summons was served on Yahoo for the email address linked to Subject Account 2, _mango_exhibicionista@yahoo.com_. Yahoo provided the following subscriber information:

> Account Status: Active
> Registration Date: 07-05-2007
> Full Name: Mango Exhibicionista
> City/State/Zip: Miami, FL, 33102
> Recovery Emails: mangoaslprofessor@gmail.com (unverified),
> trinimango7@hotmail.com (unverified)
> Recovery Phones: +17742852631 (Verified on 03-15-2020)

38.     On or about May 2, 2023, an administrative summons was served on T-Mobile for the phone number ending in 2631. On the same day, T-Mobile provided the following subscriber records:

> Customer Name:        Larry STEPHEN
> Subscriber Name:      A.S.[8]
> Service Address:      71 Crosby Rd, Marlborough, MA 01752
> Billing Address:      71 Crosby Rd, Marlborough, MA 01752

---

[8] This is the same "A.S." as discussed in footnote 5.

39.     Records from the Middlesex South Registry of Deeds indicate that STEPHEN and his wife, A.S.[9] are the owners of the SUBJECT PREMISES.

40.     On April 20, 2023, I requested an address verification for persons receiving mail at the SUBJECT PREMISES from U.S. Postal Inspection Service ("USPIS") Operations Technician Tracy Candelli. On April 21, 2023, Ms. Candelli provided me with information indicating that two individuals, "Larry Stephen," and "A.S.[10]" currently receive mail at the SUBJECT PREMISES.

41.     On May 22, 2023, at approximately 08:30 AM, I conducted surveillance of the SUBJECT PREMISES. I observed a light blue Toyota Sienna bearing Massachusetts license plate 312DG9 exit the garage and park in the driveway. I observed STEPHEN exit the vehicle and put something in his mailbox. I then observed STEPHEN depart the SUBJECT PREMISES in the aforementioned vehicle. This vehicle is registered to STEPHEN.


### *CHARACTERTISTICS COMMON TO CONSUMERS OF CHILD PORNOGRAPHY*

42.     Based on my previous training and knowledge gathered from other law enforcement officers with vast experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who create, possess, receive, distribute, or access with intent to view child pornography (collectively, "consumers" of child pornography) have a sexual interest in children and in images of children.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and

---

[9] This is the same "A.S." as discussed in footnote 5.

[10] This is the same "A.S." as discussed in footnote 5.

experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to such consumers of child pornography, as outlined in the following paragraphs.

43.     The majority of consumers of child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

44.     Consumers of child pornography may collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics, or digital or other images for their own sexual gratification.  These individuals often also collect child erotica, which may consist of images or text that do not rise to the level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children.  Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that are used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.  In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

45.     Many consumers of child pornography maintain their sexually explicit materials for several years and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They regularly maintain their collections in the privacy and security of their homes, inside their cars, on their person, or in cloud-based online storage. Depending on their technical expertise, access to child pornography on seemingly "safe" networks like Tor, or struggle with addiction to child pornography, many consumers of child

pornography have been found to download, view, and then delete child pornography on their digital devices on a cyclical and repetitive basis.

46.     Importantly evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[11]

47.     Consumers of child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support.  This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. Furthermore, individuals who would have knowledge about how to access a hidden and embedded chat site would have gained knowledge of its location through online communication with others of similar interest.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, bulletin boards, chat sites, web forums, instant messaging applications, and other similar vehicles of communication.

48.     Consumers of child pornography often collect, read, copy, or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral,

---

[11] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

exchange, or commercial profit.  These names may be maintained in the original medium from which they were derived, in written hardcopy, on computer storage devices, or merely on scraps of paper.

49.     Based upon training and knowledge gathered from other law enforcement officers with vast experience, I know that persons engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography.  Likewise, I know from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

50.     Based on my training, knowledge, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage device and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that he possesses or controls.  Additionally, based on this training and experience, I understand that even when the target uses a portable device (such as a cell phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will also be found in his home, the SUBJECT PREMISES, as set forth in Attachment A, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

51.     Based on the facts outlined herein, I believe that STEPHEN likely displays characteristics common to consumers of child pornography. In particular, it is likely STEPHEN used Subject Account 1 and Subject Account 2 to potentially receive and share child pornography files, and it is likely that evidence of this use will be found on computer equipment in his residence and/or on his person.

### BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

52.      I have had both training and experience in the investigation of computer-related crimes, including those involving child pornography. Based on my training and experience, I know the following:

a.   Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.   Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable, or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types - including computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can

easily be concealed and carried on an individual's person.  Smartphones are also often carried on an individual's person.

d.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

e.   Individuals also use online resources to retrieve and store child pornography.  Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

f.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional.  Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.

g.   Such information is often maintained indefinitely until overwritten by other data.

*SEIZURE OF COMPUTER EQUIPMENT AND DATA*

53.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES and on STEPHEN's person, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or on other electronic devices or storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media and the copying of electronically stored information, all under Rule 41(e)(2)(B).

54.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

55.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. This is true because:

a.   Electronic files downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.   Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

56. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this

forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES or on the person of STEPHEN because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of

anti-virus, spyware, and malware detection programs may indicate whether the computer

was remotely accessed, thus inculpating, or exculpating the computer owner.  Further,

computer and storage media activity can indicate how and when the computer or storage

media was accessed or used.  For example, as described herein, computers typically

contain information that log: computer user account session times and durations,

computer activity associated with user accounts, electronic storage media that connected

with the computer, and the IP addresses through which the computer accessed networks

and the internet.  Such information allows investigators to understand the chronological

context of computer or electronic storage media access, use, and events relating to the

crime under investigation.  Additionally, some information stored within a computer or

electronic storage media may provide crucial evidence relating to the physical location of

other evidence and the suspect.  For example, images stored on a computer may both

show a particular location and have geolocation information incorporated into its file

data.  Such file data typically also contains information indicating when the file or image

was created.  The existence of such image files, along with external device connection

logs, may also indicate the presence of additional electronic storage media (e.g., a digital

camera or cellular phone with an incorporated camera).  The geographic and timeline

information described herein may either inculpate or exculpate the computer user.  Last,

information stored within a computer may provide relevant insight into the computer

user's state of mind as it relates to the offense under investigation.  For example,

information within the computer may indicate the owner's motive and intent to commit a

crime (e.g., internet searches indicating criminal planning), or consciousness of guilt

(e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

57.   I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime.  From my training and

experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

58.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true due to:

a.  The volume of evidence—storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.  Technical requirements—analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient

specialized skill to best analyze the system and its data.  Furthermore, data analysis

protocols are exacting procedures, designed to protect the integrity of the evidence and to

recover even "hidden," deleted, compressed, or encrypted files.  Many commercial

computer software programs also save data in unique formats that are not conducive to

standard data searches.  Additionally, computer evidence is extremely vulnerable to

tampering or destruction, both from external sources and destructive code imbedded in

the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or

seize the computer equipment for subsequent processing elsewhere.

59.      The SUBJECT PREMISES may contain computer equipment whose use in the

crime(s) or storage of the things described in this warrant is impractical to determine at the

scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's

knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive

determination of their ownership at the premises during the execution of this warrant.  If the

things described in Attachment B are of the type that might be found on any of the computer

equipment, this application seeks permission to search and seize it onsite or off-site in order to

determine their true use or contents, regardless of how the contents or ownership appear or are

described by people at the scene of the search.

60.      The law enforcement agents will endeavor to search and seize only the computer

equipment which, upon reasonable inspection and/or investigation conducted during the

execution of the search, reasonably appear to contain the evidence in Attachment B.  If, however,

the law enforcement agents cannot make a determination as to use or ownership regarding any

particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

61.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

62.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  Review of this electronic data may be conducted by any government personnel assisting in the investigation, including law enforcement officers and agents, attorneys for the government, attorney support staff and technical experts subject to the limitations of the warrant. Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review subject to the restrictions of the warrant.


(remainder of page intentionally blank)

## CONCLUSION

63.     Based on the foregoing, there is probable cause to believe that Larry STEPHEN

has violated 18 U.S.C. § 2252A (possession, distribution, and receipt of child pornography).

64.     Based on the foregoing, there is also probable cause to believe that the evidence,

fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located

at the SUBJECT PREMISES, as more fully described in Attachment A-1, and on the person of

STEPHEN, as more fully described in Attachment A-2.

65.     Therefore, I respectfully request that this Court issue a search warrant for the

SUBJECT PREMISES described in Attachment A-1 and the person of STEPHEN described in

Attachment A-2, authorizing the seizure and search of the items described in Attachment B.


                                        /s/ Meghan K. Ronayne
                                        _____
                                        MEGHAN K. RONAYNE
                                        HOMELAND SECURITY INVESTIGATIONS


Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 this 5th day of
June, 2023


HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE


30

## ATTACHMENT A-1

### DESCRIPTION OF LOCATION TO BE SEARCHED

The entire property located at 71 Crosby Road, in Marlborough, Massachusetts, including any outbuildings solely controlled by the occupants of the aforementioned residence, and any appurtenances thereto (the "SUBJECT PREMISES").  The SUBJECT PREMISES, pictured below, is a split-level raised ranch style, single family home.  The residence has a red brick exterior, with green shutters on the windows. The front door of the residence is white in color. There is a one car garage entrance on the side of the home, and a detached two-story garage located at the top of the driveway. The detached garage is gray in color with white trim.



**ATTACHMENT A-2**

**DESCRIPTION OF PERSON TO BE SEARCHED**

The person to be searched is Larry STEPHEN (YOB 1978), provided that STEPHEN is located within the District of Massachusetts at the time of the search.



## ATTACHMENT B

### ITEMS TO BE SEIZED AND SEARCHED

I.    All records, in whatever form, and tangible objects that constitute evidence, fruits, or

instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2)(A) & 2252A(a)(5)(B)

(possession, receipt, and distribution of child pornography), including:

   A.    Records and tangible objects pertaining to the following topics:

      1.    Child pornography;

      2.    The sexual abuse or exploitation of children;

      3.    Child erotica;

      4.    The identity of any child depicted in videos and photographs located in the equipment or discussed in any communications related to child pornography or the sexual abuse or exploitation of children;

      5.    Internet activity reflecting a sexual interest in minors or child pornography;

      6.    Membership in online groups, clubs, or services that provide, make accessible, or otherwise concern child pornography;

      7.    The Social Media Platform A account associated with username mangoexhib@gmail.com, mangoexib, Subject Account 1;

      8.    The Snapchat account associated with username mangoexib, Subject Account 2;

      9.    the address 71 Crosby Road, Marlborough, MA

      10.    Proof of ownership and control of the email account mangoexhib@gmail.com;

      11.    Proof of ownership and control of the email account mango_exhibicionista@yahoo.com;

      12.    The phone assigned 1-774-285-2631;

      13.    Proof of ownership and control of the email account larry@msada-dc.org;

      14.    Proof of ownership and control of the email account mangoaslprofessor@gmail.com

   B.    For any computer hardware, computer software, computer-related documentation,

or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1.    evidence of who used, owned, or controlled the computer equipment;

2.    evidence of computer software that would allow others to control the items, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

3.    evidence of the attachment of other computer hardware or storage media;

4.    evidence of counter forensic programs and associated data that are designed to eliminate data;

5.    evidence indicating how and when the computer equipment was accessed or used;

6.    records of or information about any Internet Protocol addresses used;

7.    passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

8.    records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;

9.    records of or information about the computer equipment's Internet activity; and

10.   contextual information necessary to understand the evidence described in this attachment.

C.    Records and tangible objects relating to the ownership, occupancy, or use of 71 Crosby Road, Marlborough, Massachusetts (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers); and

D.    Records, information, and items relating to the ownership or use of computer equipment found at 71 Crosby Road in Marlborough, Massachusetts, including sales receipts, bills for Internet access, and handwritten notes.

II.     All computer hardware, computer software, computer-related documentation, and storage media.  Off-site searching of these items shall be limited to searching for the items described in Paragraph I.

## <u>DEFINITIONS</u>

For the purpose of this warrant:

A.   "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

B.   "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cellular telephone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.   "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.   "Computer related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

E.   "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

F.   "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.    "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

H.    "Child Pornography," as defined in 18 U.S.C. § 2256(8)(A), means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct.

I.    "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

## EXECUTION

Searching agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence authorized by this warrant, as outlined above. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

Similarly, searching agents will endeavor to search only locations within the SUBJECT PREMISES that reasonably appear to be inhabited or accessed by Larry STEPHEN (including

common areas and bedrooms), or which reasonably appear to be capable of containing the evidence whose seizure is authorized by this warrant.

### RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.